IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**CAROL R. ROSEN,**

    **Plaintiff,**

v.                                                                                                     **CIV-06-0427 JH/LAM**

**U.S. BANK NATIONAL ASSOCIATION**
**as TRUSTEE, EQUIFIRST CORP.,**
**AMERICAN MORTGAGE SPECIALISTS,**
**INC., and JOHN and JANE DOES 1-10,**

    **Defendants.**

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant U.S. Bank National Association's ("U.S. Bank") Motion to Dismiss or Stay [Doc. 23, filed Aug. 7, 2006], and Defendant EquiFirst Corporation, Inc.'s ("EquiFirst") Motion for Judgment on the Pleadings [Doc. 28, filed Sept. 15, 2006]. The Court has reviewed the motions, the record in this case, and the relevant law, and concludes that the motions are well-taken and should be **GRANTED**.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Before turning to the facts presented in the pleadings in this case, the Court takes judicial notice of cases involving D. Scott Heineman and Kurt F. Johnson, who are the Trustees of the Rosen Family Trust, of which Plaintiff Carol R. Rosen is a beneficiary. *See* Doc. 17, Ex. B ¶ 4.A. Heineman and Johnson

> were the proprietors of a business that claimed to help homeowners eliminate their mortgages. [Heineman and Johnson's] business operated under the "vapor money" theory of lending, which holds that loans funded through wire transfers rather than

> through cash are unenforceable. [They] claimed that, through a complicated series of transactions, they could take advantage of this loophole and legally eliminate their clients' mortgages.
>
> In 2004, Johnson and Heineman filed a series of lawsuits against mortgage companies on behalf of their clients, seeking, among other things, a declaration that any mortgages on their clients' properties were void. All fifteen cases were . . . found . . . to be "frivolous and . . . filed in bad faith."
>
> . . . .
>
> On September 22, 2005, a federal grand jury indicted [Heineman and Johnson] on charges of mail fraud, wire fraud, and bank fraud.

*United States v. Heineman*, 2006 WL 2374580, *1 (N. D. Cal. Aug. 15, 2006). The step-by-step method Heineman and Johnson advertised over the internet and used to attempt to eliminate mortgages is as follows. They would have

> the homeowner prepare and sign a promissory note as well as a loan agreement for the encumbered property. The homeowner then sends these documents to [Heineman and Johnson] with a cashier's check "of $3,000 [to eliminate a] 1st mortgage, and $1,500 [to eliminate] a second mortgage or home equity line of credit." Once this initial fee is received, Heineman and Johnson set up a Family Estate Amenable Complex trust in the homeowner's name, *i.e.*, the Frances Kenny Family Trust. Heineman and Johnson name themselves the trustees. Title to the homeowner's property is transferred to the trust.
>
> Now in charge as trustees, Heineman and Johnson approach the bank or lending institution that lent the homeowner the money to purchase the property. They make a "Presentment" to the bank in the form of "a cash-backed bond in double-amount of the promissory note." The "bond" is allegedly "a valid, rated instrument backed by a $120 Million Letter of Credit against the Assets of an 85-year old, $800 Million Swiss Trust Company." This is essentially an offer to the lender to satisfy the borrower's indebtedness. The alleged "bond," however, is a ploy.
>
> . . . .
>
> In addition to the "bond," Heineman and Johnson hire "Trustee lawyers" to "begin the legal process by sending out a legal complaint in the form of a CPA Report that outlines 40 or more different federal laws that have been violated in the 'lending process.'" The lending institution thereafter has a certain time frame within which to

2

respond to the complaint.  Purportedly, the homeowner will be notified by plaintiffs' legal team when the loan is "satisfied."  The homeowner's "lender may or may not let [you] know or acknowledge this."

Once the loan is satisfied, "re-financing begins."  The homeowner is told to "refinance [his] property at the maximum loan to value ratio possible" with a new lender.  The alleged "purpose of this new re-financing is for you, the client, to compensate the Provider and CCR."  Heineman and Johnson are the "Provider."  They run CCR.  The proceeds from this new loan are disbursed as follows:  "The Provider receives 50%.  CCR receives 25%.  You, the client, receives the other 25%."  This entire process takes "5-7 months in most cases."  And, "[t]he end result is that the [homeowner] gets free and clear title to the home and a good amount of cash in hand."

[Heineman and Johnson], however, perpetrate a fraud to "satisfy" the original indebtedness.  One of the documents Heineman and Johnson present to the bank or lending institution is entitled a "power of attorney."  This document demands that the lender sign and thereby acknowledge that it has given the homeowner "vapor money" in exchange for an interest (via a deed of trust) in the subject property at the time of financing.  A provision of this "power of attorney" provides that the lender's "silence is deemed consent."  When the lender fails to respond, [Heineman and Johnson] execute the power of attorney.  They then sign a deed of reconveyance reconveying the lender's security interest in the property to Heineman and Johnson.  The forged power of attorney and the deed of reconveyance are duly recorded at the county recorder's office.  The county's records thus show a power of attorney from the lender granting Heineman and Johnson the right to sign the deed of reconveyance and the reconveyance from the original lender.  The title seems clear and unencumbered.  The lender is unaware of the maneuver.

[Heineman and Johnson] then turn around and from an unsuspecting new lender seek a loan to refinance the property.  When the new lender conducts a preliminary title search, it discovers the power of attorney and deed of reconveyance, both of which appear to have been validly executed.  From the new lender's point of view, the property appears to be unencumbered.  And it is thus willing to refinance the property.

. . . .

At the conclusion of this process, the borrower is in even worse condition than when he or she first looked to [Heineman and Johnson] for debt relief.  Two lenders believe that they have valid security interests in the subject property.  When the homeowner defaults on both loans, both lenders commence foreclosure proceedings.  In response, Heineman and Johnson, as trustees, file a bankruptcy petition on behalf of the borrower or file suit alleging that no enforceable debt accrued from either lender

3

>because the loans were funded through wire transfers rather than cash. Fifteen such lawsuits were filed in [the Northern District of California] on such a "vapor money" theory.

*Frances Kenny Family Trust v. World Sav. Bank FSB*, 2005 WL 106792 at *1-*3 (N. D. Cal., Jan. 19, 2005).

The following facts are taken from Rosen's Amended Complaint and from the exhibits attached to her complaint and to U.S. Bank's Answer. They demonstrate a pattern strikingly and disturbingly similar to the one described above. In December 2004, Rosen quitclaimed her property located on Wellesley Drive in Albuquerque, NM to Heineman and Johnson, as Trustees of the Rosen Family Trust. *See* Doc. 17, Ex. B ¶ 4.A. Colonial Savings held a mortgage secured by the Wellesley property. On March 3, 2005, Heineman, acting as "Attorney-in-Fact" for Colonial Savings, executed and recorded a notarized "Discharge of Mortgage" purporting to release Rosen from her mortgage of $86,250. *Id.* Ex. A. The Discharge stated that the mortgage had been "fully paid, satisfied, and discharged" and that Heineman's power of attorney to act on behalf of Colonial Savings was granted "through the doctrine of agency by estoppel." *Id.* The Vice President of Colonial Savings, however, recorded an "Affidavit of Fraudulent Recording of Discharge of Mortgage," disputing that Heineman had any authority to act on Colonial's behalf or discharge the mortgage and attesting that the note and mortgage had not been paid. *Id.*

On April 27, 2005, Rosen submitted a loan application to Defendant American Mortgage Specialists, Inc. ("American Mortgage"), a mortgage broker located in Arizona, for the purpose of refinancing the Wellesley property. *See* Am. Compl. at ¶¶ 8, 10-11 & Ex. A (Doc. 13). Rosen subsequently executed a note for $198,305 in favor of EquiFirst, secured by a Deed of Trust on the Wellesley property. *See id.* Ex. A, B. The mortgage provides that, if the note was sold or the Loan

4

Servicer was changed, EquiFirst would give Rosen written notice, together with "any other information RESPA requires." *Id.* Ex. B at 13.

Rosen signed the note and mortgage on May 17, 2005. *See id.* at 16. The loan was closed that same day, and proceeds were disbursed on May 23, 2005, including over $29,000 to third-party creditors. *See* Am. Compl. Ex. G. Colonial Savings is not included in the list of payoff recipients. *See id.*

Lines 801, 812, and 814 of the closing statement, under the heading "ITEMS PAYABLE IN CONNECTION WITH LOAN," show that a 1% "loan origination fee" of $1983.05 as well as "OTHER BRK FEES" of $1762 were paid to American Mortgage from Rosen's loan proceeds, and that a $940 "LENDER ORIGINATION" fee was paid to EquiFirst from Rosen's loan proceeds. *Id.* at 2. In addition, line 813 of the closing statement states: "BROKER FEE PAID BY LENDER YSP $3,966.10 POC.[1]" *Id.* This represented a yield spread premium that EquiFirst additionally paid to American Mortgage upon the loan closing.

On June 21, 2005, EquiFirst and Homecomings Financial notified Rosen that the servicing of her mortgage loan (i.e., the right to collect payment from her) had been transferred to Homecomings Financial and that the effective date of transfer would be June 29, 2005. *See* Am. Compl., Ex. C. The transfer of servicing did not affect the terms or conditions of the mortgage. *See id.* Further, during the 60 days following the effective date of transfer, timely loan payments made to EquiFirst could not be treated as late by Homecomings Financial. *See id.*

On July 11, 2005, Rosen executed a Grant Deed granting "to D. Scott Heineman and Kurt F.

---

[1] "YSP" is an abbreviation for "yield spread premium" and "POC" is an abbreviation for "paid outside closing."  Am. Compl., Ex. H

5

Johnson, Trustees of Rosen Family Trust, for a valuable consideration . . ." her Wellesley Drive property that secured her EquiFirst mortgage. Am. Compl. at ¶ 26, Ex. D. The complaint does not state whether Rosen gave Homecomings Financial or EquiFirst notice of her transfer of ownership of the property to the Trust. According to her "Affidavit of Sum Certain," Rosen made only three mortgage payments between the time she closed the EquiFirst loan in May 2005 and August 7, 2006, when she filed the affidavit. *See* Doc. 22.

On January 23, 2006, EquiFirst granted, assigned, and transferred its beneficial interest in Rosen's mortgage to Defendant U.S. Bank as Trustee. *See* Am. Compl., Ex. E. U.S. Bank initiated foreclosure proceedings on Rosen's mortgage and the Wellesley Drive property on February 1, 2006, in state district court. *See* Am. Compl. ¶ 28. On May 11, 2006, Rosen mailed a "notice of rescission" to EquiFirst, U.S. Bank, and Homecomings Financial. *See id.* ¶ 42, Ex. I. She alleged a right to rescind her mortgage transaction based on her claim that, when she closed the loan in May 2005, "EquiFirst failed to meet the requirements to give me accurate material disclosures and the proper notice of the right to rescind." Am. Compl., Ex. I ¶ 7. She also claimed that "[a] broker's fee, in the form of a yield spread premium, was fraudulently assessed to the loan transaction, . . . [which] renders the HUD 1/Settlement Statement defective, inter alia, because it does not state to whom the fee was paid . . . [and because] the charge was encoded, to the extent that no consumer or most any other person could decipher [it] . . . ." *Id.* ¶ 10B. Rosen claimed that these failures extended her statutory right to rescind from the regular three-day period to a three-year period. *See id.* ¶ 10D. Homecomings Financial, through counsel, responded to Rosen's May 11 letter on June 6, 2006. It sent Rosen a copy of the Notice of Right to Cancel she signed on May 17, 2005, in which she acknowledged receipt of two copies of the Notice. *See* Am. Compl., Ex. H. It asserted that the

6

abbreviations of "YSP" and "POC" "are standard terms within the mortgage banking industry" and that, if she'd had any concerns about those terms, she should have addressed them at closing. *Id.* Finding no basis for rescission, it refused to rescind the loan transaction.

Rosen filed her initial complaint in federal court on May 19, 2006, seeking declaratory and injunctive relief and monetary damages. *See* Doc. 1. She filed an amended complaint on July 17, 2006, that contains six claims. Count One is for rescission under 15 U.S.C. § 1635 and § 226.23 of Regulation Z of the Truth in Lending Act ("TILA"). *See* Am. Compl. ¶¶ 33, 48. She claims that recission "extinguishes any liability Plaintiff may have had to Defendants for finance or other charges arising from the [loan] Transaction," *id.* ¶ 49, and that "Defendants [sic] failure to take action to reflect the termination of the security interest in the property within twenty . . . days of [her] rescission . . . releases [her] from any liability whatsoever to Defendants." *Id.* ¶ 50.

Count Two alleges damages under 15 U.S.C. § 1640 for Defendants' failure to comply with § 1635 after Defendants received Rosen's rescission letter. *Id.* ¶¶ 51-52. Count Three is for recoupment of a statutory penalty provided under § 1640. In support, Rosen lists twenty-eight alleged violations of various federal and state statutes and regulations. *See id.* ¶¶ 54(a)-(bb).

Count Four alleges violation of a right to Equal Credit Opportunity as described in 12 C.F.R. § 202.14. In support, Rosen alleges that the Defendants failed to make clear and conspicuous disclosures, and that various documents were confusing. *See id.* ¶ 55.

Count Five alleges violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-17. Rosen claims that Defendants failed to give her fifteen days notice before the loan servicing contract was assigned from EquiFirst to Homecomings Financials in violation of § 2605(b), *see* Am. Compl. ¶¶ 57-59, and that EquiFirst's payment of the yield-spread premium to American

Mortgage constituted an illegal fee or "kickback" violating 12 U.S.C. § 2607(a)[2], *see id.* ¶ 60. Additionally, she alleges that EquiFirst and American Mortgage engaged in "fee splitting" in violation of § 2607(d)[3]. *Id.* ¶ 61.

Court Six alleges violation of the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 *et seq.*, based on the same allegations that EquiFirst and American Mortgage engaged in illegal kickback and fee-splitting activities that caused her to pay a higher interest rate. *See* Am. Compl. ¶¶ 63-68, 76.

Rosen seeks: (i) a judicial declaration that she validly rescinded the loan and is not liable for any finance or other charges and has no liability whatsoever to Defendants; (ii) an order requiring Defendants to terminate their security interest in her home; (iii) an injunction enjoining Defendants from maintaining foreclosure proceedings or otherwise taking steps to deprive her of ownership of the property; (iv) an award of statutory damages and penalties; and (v) attorney fees. *See id.* at 26-27.

## II.  LEGAL STANDARDS

U.S. Bank's motion to dismiss is brought pursuant to Fed R. Civ. P. 12(b)(6). It asserts that Rosen has failed to state claims under particular statutes and that other claims are time-barred. It urges the Court to abstain from asserting jurisdiction over any remaining claims that should be resolved in the pending state foreclosure action. EquiFirst moves for dismissal under Fed. R. Civ. P. 12(c) ("Judgment on the Pleadings"), asserting that it is entitled to judgment as a matter of law on Counts One through Four and Count Six, and on part of Count Five of Rosen's amended complaint. In resolving motions brought under either Rule 12(b)(6) or 12(c), the Court must

---

[2] Although Rosen cites 12 U.S.C. § 1207(a) as the statute violated, there is no such statute and her citation to 24 C.F.R. § 3500.14 refers to violations of § 2607. The Court therefore construes her complaint to allege violations of § 2607.

[3] *See* footnote 2.

8

> accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same. Judgment on the pleadings should not be granted "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000). As with . . . motions to dismiss under Rule 12(b)(6), documents attached to the pleadings are exhibits and are to be considered in [reviewing] . . . [a] 12(c) motion. *See Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991); Fed. R. Civ. P. 10(c).

*Park Univ. Enter., Inc. v. Am. Cas. Co. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006).

> It is true that dismissal under Rule 12(b)(6) is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice. It is also well established that dismissal of a complaint is proper only if it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.

*Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (internal quotation marks and citations omitted). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

In reviewing a pro se complaint, a court applies the same legal standards applicable to pleadings counsel has drafted, but is mindful that the complaint must be liberally construed. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But "[t]he broad reading of the plaintiff's complaint does not relieve the plaintiff of alleging sufficient facts on which a recognized legal claim could be based." *Id.*

> [T]he [pro se] plaintiff whose factual allegations are close to stating a claim but are missing some important element that may not have occurred to him, should be allowed to amend his complaint. Nevertheless, conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based. This is so because a pro se plaintiff requires no special legal training to recount the facts

9

> surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted. Moreover, in analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations.

*Id.* (citations omitted). The legal sufficiency of a complaint is a question of law. *See Moore*, 438 F.3d at 1039.

### III. ANALYSIS

### A. ROSEN FAILS TO STATE A CLAIM FOR RESCISSION.

In transactions covered by the TILA, the borrower is entitled to rescind the transaction. *See* § 1635(a). The right to rescind lasts for three days, if the lender has given the borrower the disclosures required by the TILA and a notice of the right to rescind; the right lasts up to three years if the lender fails to give the requisite disclosures and notice, unless the borrower sells or transfers the property to someone else before the end of the three-year period[4]. *See* § 1635(f). EquiFirst asserts

---

[4] Section 1635 provides, in relevant part:
(a) Disclosure of obligor's right to rescind

Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.
. . . .
(f) Time limit for exercise of right

An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor . . . .

that Rosen's right to rescind expired by operation of law upon her transfer of her ownership interest in the Wellesley Drive property to Heineman and Johnson as Trustees of the Rosen Family Trust. Rosen contends, however, that because she did not actually sell the Wellesley Drive property and maintains a beneficial interest in remaining in the house (apparently by the terms of the Trust, which is not part of the record), her right to rescind has not expired.

Congress gave the Board of Governors of the Federal Reserve System broad authority to promulgate extensive regulations implementing the TILA, *see* 15 U.S.C. § 1604(a), which it calls Regulation Z, *see* 12 C.F.R. § 226.1(a). In interpreting and implementing § 1635(f), Regulation Z specifically provides that the borrower's right to rescind immediately expires not only "upon sale of the property," but also "upon transfer of all of the [borrower's] interest in the property." 12 C.F.R. § 226.23(a)(3). The parties do not point to anything within the TILA, Regulation Z, or case law that further defines the extent of the borrower's interest that must be transferred in order to trigger expiration of the right to rescind, and the Court has found none in its own research.

But the Court concludes that the words "all of the [borrower's] interest" means all of the borrower's *ownership* or title interest for several reasons. First, the Board clarified through § 226.23(a)(3) that something less than an outright sale of the property triggers expiration of the right to rescind. Second, because TILA provides for penalties when a lender fails to comply with rescission requirements and gives the lender only twenty days to return earnest money, down payments, and accrued interest and payments and to remove the security interest after receiving notice of the recission letter, *see* 15 U.S.C. § 1635(b), the lender must be able to quickly ascertain whether the borrower still legally owns the property securing the loan and has a statutory right to rescind. The only way to timely accomplish this goal is to examine the real property records in the county where the real

11

property title is recorded. If, as here, those records demonstrate that the borrower has transferred her ownership and legal interests in the property, for valuable consideration, to another entity controlled by someone other than the borrower, the lender can reasonably contest the borrower's right to rescission without fear of penalty. Trust documents that may contractually grant various types of beneficial interests after the sale or transfer of all of a borrower's ownership interest in property are not generally filed in the public records, and a lender should not be required to assume that a beneficial interest of some sort may secretly exist that would hypothetically extend the borrower's right to rescission. It is therefore consistent with the TILA's goals to interpret "interest" as "ownership interest." *See Williams v. Homestake Mortgage Co*., 968 F.2d 1137, 1140 (11th Cir. 1992) (noting that "another goal of § 1635(b) ['s recission requirement] is to return the parties most nearly to the position they held prior to entering the transaction").

"Although the right to rescind is statutorily granted [in the TILA], it remains an equitable doctrine subject to equitable considerations. . . . Thus, district courts are to consider traditional equitable notions in applying [the TILA's] statutory grant of rescission." *Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n* , 683 F.2d 444, 447 (D.C. Cir. 1982); *see In re Ramirez*, 329 B.R. 727, 738 (D. Kan. 2005) (stating that, "[r]escission, whether statutory or common law, is an equitable remedy. Its relief, in design and effect, is to restore the parties to their pre-transaction positions. The TILA authorizes the courts to apply equitable principles to the rescission process. . . . [W]ithin the context of the TILA, rescission is a remedy that restores the status quo ante."). Because Rosen has transferred her ownership of the property to a third party, the parties cannot be returned to their pre-transaction positions, which would unfairly prejudice EquiFirst if she maintained the right to recission. *Cf., e.g., Powers v. Sims & Levin*, 542 F.2d 1216, 1221-22 (4th Cir. 1976) (holding that a court could condition

12

the borrowers' continuing right of rescission upon tender to the lender of all of the funds spent by the lender in discharging the earlier indebtedness of the borrowers as well as the value of the home improvements). Without legal ownership of the Wellesley property to use as security for another mortgage, Rosen most likely could not return the $198,305 EquiFirst gave to her and her creditors. Equity therefore requires that the Court interpret § 226.23(a)(3) to provide for expiration of the right to rescission upon the transfer of a borrower's ownership interest in the property securing a loan. *See Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 411-12, 417-19 (1998) (noting that "a statutory right of rescission could cloud a bank's title on foreclosure, [so] Congress may well have chosen to circumscribe that risk" by "governing the life" of the right to rescission with absolute expiration provisions under § 1635(f), "while permitting recoupment damages regardless of the date a collection action may be brought," and holding that a borrower may not assert the right to rescind as an affirmative defense in a collection action after the right has expired by operation of law).

Finally, TILA is a strict liability statute. *See Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983) ("To insure that the consumer is protected, as Congress envisioned, requires that the provisions of [the TILA and Regulation Z] be absolutely complied with and strictly enforced."); *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980) (noting that the TILA and its regulations mandate a standard of disclosure of certain information in financing agreements and enforce that mandate by "a system of strict liability in favor of consumers who have secured financing when this standard is not met"). There should, therefore, be a bright line delineating the borrower's and lender's rights and responsibilities. Interpreting § 226.23(a)(3) to mean that transfer of all of the borrower's ownership interest in the property securing a loan triggers expiration of the right to rescission preserves an easily-ascertainable bright line.

The Court concludes that, when Rosen transferred her ownership interest in the Wellesley Drive property to a Trust with Trustees other than herself on July 11, 2005, her right to rescission expired that same date by operation of law.  Her May 11, 2006, recission letter was untimely and ineffective. She therefore cannot state a cause of action for rescission, and Count One must be dismissed.  Accordingly, her claims stated in Count Two for monetary damages and penalties arising from Defendants' refusal to rescind the refinancing contract must also be dismissed.

**B. CLAIMS FOR DAMAGES UNDER TILA ARE TIME BARRED.**

"Section 1640 is a general 'civil liability' section in the TILA.  In subsection (a) it provides for either actual and/or statutory damages for various TILA violations" set forth in parts B, D, and E of the subchapter.  *Baker v. Sunny Chevrolet, Inc*., 349 F.3d 862, 870 (6th Cir. 2003); § 1640(a) (providing liability for creditors who fail to comply with "any requirements imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter").  Count Three, for recoupment of a statutory penalty provided under § 1640 alleges violations of not only TILA, but also of various other non-TILA regulations and the New Mexico UCC.  Insofar as Rosen attempts to recover damages for violation of statutes not listed in § 1640(a), she has failed to state a claim.

Further, her claims for failing to disclose information or otherwise violating subchapter B at the time of closing must be dismissed as time barred.  As both U.S. Bank and EquiFirst point out, claims for damages under § 1640 of TILA have a one-year limitations period.  *See* § 1640(e) ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation . . . .").  A review of Rosen's complaint reveals that all alleged violations of subchapter B occurred at or before

14

closing on May 17, 2005, but she did not file her complaint until more than one year later. Count Three must be dismissed.

### D.  ROSEN FAILS TO STATE A CLAIM FOR VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT.

The Equal Credit Opportunity Act, codified at 15 U.S.C. § 1691-1691(f), makes it unlawful for a creditor to discriminate "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); [] because all or part of the applicant's income derives from any public assistance program; or [] because the applicant has in good faith exercised any right under [TILA]."  § 1691(a).  Rosen's amended complaint alleges no facts to support a claim for violation of the Act, and she made no argument in her response brief to support amendment.  Count Four must be dismissed.

### E.  RESPA CLAIMS MUST BE DISMISSED.

Rosen attempts to assert two types of claims under RESPA in Count Five of the Amended Complaint. The first is for violation, on June 21, 2005, of a provision that requires creditors to give a borrower fifteen days notice before transferring an account to a different loan servicer. *See* § 2605(b)(2)(A) ("Except as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan."). To recover under § 2605, the borrower must allege and show actual damages suffered "as a result of the failure." § 2605(f)(1)(A). If the borrower also alleges and establishes that the violation is a "pattern or practice of noncompliance," a court may additionally award statutory damages "not to exceed $1000." § 2605(f)(1)(B). Although the Amended Complaint neither alleges that Rosen suffered any actual damages as a result of EquiFirst's failure to give her a

15

full 15-days notice of the change of loan servicer, nor alleges that EquiFirst engaged in a pattern or practice of not complying with the 15-day notice requirement, Rosen requests that the Court "reduce the amount owed by Plaintiff by the amount of statutory and actual damages available under RESPA." Am. Compl. at 22.

Because she has not alleged she suffered actual damages, the Court concludes that Rosen has failed to state a claim for damages under § 2605 and that she should not be given an opportunity to amend her complaint because none of the Defendants have attempted, in this federal suit, to bring any claims for money Rosen owes them. Any claims for recoupment that Rosen may be able to bring are relevant to the state foreclosure action and should be litigated there. *Cf. Demmler v. Bank One NA*, 2006 WL 640499, *5 (S.D. Ohio, Mar. 9, 2006) (alternatively holding that the plaintiff's claims brought pursuant to TILA and other federal statutes against lending bank and challenging validity of loan were barred because they were compulsory counterclaims that should have been raised in the foreclosure action in state court).

Rosen alleges that Defendants violated § 2607 by giving "kickbacks" or engaging in "fee-splitting" on May 17, 2005, when EquiFirst paid a broker's fee to American Mortgage as a yield-spread premium. The statute of limitations for violations of § 2607 is one year from the date the violation is alleged to have occurred. *See* 12 U.S.C. § 2614. The Court concludes that Rosen's claims for violation of § 2607 are barred by the one-year statute of limitations. *See Snow v. First Am. Title Ins. Co.*, 332 F.3d 356, 359-60 (5th Cir. 2003) ("The primary ill that § 2607 is designed to remedy is the potential for 'unnecessarily high settlement charges,' § 2601(a), caused by kickbacks, fee-splitting, and other practices that suppress price competition for settlement services. This ill occurs, if at all, when the plaintiff pays for the service, typically at the closing. Plaintiffs therefore

16

could have sued at that moment, and the standard rule is that the limitations period commences when the plaintiff has a complete and present cause of action.") (internal quotation marks and bracket omitted). Rosen's argument that her claim survives the one-year statute of limitations because it is one for recoupment is unavailing because Defendants have not sued her by way of counter-claim in this federal suit. Again, any claims for recoupment should have been brought as a defense in the state foreclosure action. *See* 15 U.S.C. § 1640(e); *Beach*, 523 U.S. at 417-19.

## F. THE COURT WILL NOT TAKE SUPPLEMENTAL JURISDICTION OVER POTENTIAL STATE-LAW CLAIMS.

The Tenth Circuit has instructed district courts that, when federal jurisdiction is based solely upon a federal question, absent a showing that "the parties have already expended a great deal of time and energy on the state law claims, . . . a district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial." *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002); *see Sawyer v. County of Creek*, 908 F.2d 663, 668 (10th Cir. 1990) ("Because we dismiss the federal causes of action prior to trial, we hold that the state claims should be dismissed for lack of pendent jurisdiction."). None of the factors identified in *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) – "the nature and extent of pretrial proceedings, judicial economy, convenience, or fairness" – would be served by retaining jurisdiction over any potential state-law claim in this case. No discovery has been conducted in this case, and no energy has been expended on the potential state-law claims. The Court will dismiss Rosen's state-law claims for violation of the New Mexico Unfair Practices Act contained in Count Six of her amended complaint.

**NOW, THEREFORE**, **IT IS ORDERED** that all Counts of Rosen's federal complaint are

DISMISSED.

**Dated this 8th day of November, 2006.**

_____
**UNITED STATES DISTRICT JUDGE**

*Attorney for Plaintiff:*
    Carol Rosen
    106 Wellesley Dr. S.E.
    Albuquerque, NM 87106-1444

*Attorney for Defendant U.S. Bank*:
    Rhodes & Salmon, P.C.
    William C. Salmon
    1801 Lomas Blvd. N.W.
    Albuquerque, NM 87104

*Attorney for Defendant EquiFirst*:
    Karla Poe
    Rodey, Dickason, Sloan, Akin & Robb, P.A.
    P.O. Box 1888
    Albuquerque, NM 87103-1888

    Kimberly Smith Rivera
    McGlinchey Staford, PLLC
    25550 Chagrin Blvd., Ste. 406
    Cleveland, OH 44122